Good morning, and may it please the court. J.T. Morris with the Foundation for Individual Rights and Expression on behalf of plaintiffs. For over a year, the prior restraint has stifled protected student expression at West Texas A&M, all because the university's president, Walter Wendler, believes that protected expression, tracked performances, sends a message that no idea, no message, and no viewpoint on campus is safe, regardless of where it falls on the political or cultural spectrum. Thankfully, the First Amendment, not the personal views of campus bureaucrats, dictates free expression at our public universities. Upholding that core principle is what's at stake here. Decades of Supreme Court precedent and precedent lead no doubt President Wendler's censorship of what he calls artistic expression violates the First Amendment. Now, President Wendler asked this court to set that precedent aside and instead to trust him, insisting in his brief that any federal court is ill-suited to second-guess him because he's a veteran college administrator. The Constitution begs to differ. Veteran or not, when public college administrators impose viewpoint-based prior restraints that deny students the right to speak in public campus forums that the school has set aside for that very purpose, they deserve no deference and instead face a heavy presumption of unconstitutionality. President Wendler is no exception, and his post-lawsuit excuses for silencing plaintiffs here fall flat. Just look no further than his recent April 17th letter from counsel acknowledging that the policy he first cited in his briefs as supporting his drag show ban actually had been defunct for a year when he banned drag shows from campus. The district court should have put a swift end to this prior restraint, but instead it ignored it altogether, while at the same time making clear First Amendment errors over First Amendment protection for expressive conduct in the First Amendment's bar against viewpoint discrimination. We ask this court to reverse and restore the First Amendment to West Texas A&M. I want to start by urging the court that there is a straightforward path to reversal here, one rooted in precedent, not only just precedent, but precedent that these promotions be CONRAD. It sounds like a key part of your argument today is that we don't trust university administrators to decide whose speech rights should be respected and whose should not, right? We don't defer. Absolutely not, Your Honor. And I'm profoundly sympathetic to that viewpoint, sorry, to that, I'm profoundly sympathetic to that position. How do you reconcile that, though, with CLS v. Martinez, which seems to specifically say that we have to defer to university administrators, particularly when it comes to issues of inclusion? I think because CLS, Your Honor, is a narrow decision that is sort of the mirror image of this case. In CLS, the Supreme Court said you had a, according to the Supreme Court, a content-neutral, generally applicable policy that the plaintiff there wanted an exclusion from. Here is the exact opposite. What we have is a student group asking the— Both stated policies, sorry for interrupting, I want to hear your argument, but just to be clear, the university policies stated in both cases seem to have at least two commonalities. One, the stated interest by the university is making everybody feel included. And two, a lot of skepticism from certain quarters about whether that was a sincere interest in inclusion as opposed to actually an exclusion, an exclusionary interest. And yet CLS said we defer. CLS said we defer. Maybe we should overturn CLS. Many people would like to see CLS overturned, but that's obviously not a job for us. Maybe you're here to get to the Supreme Court, which I would certainly welcome you to try. Certainly, Your Honor, and I don't think we need to get there. I think this Court can compel affirmance here for the simple reason, again, yes, the Supreme Court said in CLS we're going to let these administrators impose a content-neutral restriction on access to public forums. That's not what we have here. When campus administrators impose viewpoint-based and content-based restrictions— But what's the view that's being excluded here? To my understanding, it's a particular type of expression that is being excluded, not a particular viewpoint, which is why it seems to me CLS is fairly similar. I think they're— CLS is saying we only want organizations to express themselves in an inclusive context. It seems to me that this is very similar. I disagree with that point, Your Honor. I think there are three paths to viewpoint discrimination here. The first is straightforward. President Wendler is saying by my subjective determination, the message expressed by student drag shows is offensive. That's Mattel. That's Johnson. That's Cohen. That's what this Court says. Isn't that essentially what the Dean of Hastings was saying in CLS, that we think groups should not exclude anybody? But that's an exclusion. That's the group excluding people. Here, it's the university that's excluding a student group from a open campus forum based on viewpoint. And to answer your past question, Your Honor, there are two other viewpoints that President Wendler is discriminating against. One is the most obvious viewpoint communicated by drag, and that's challenging gender norms. He is saying, I find that offensive to women. He's straight up discriminating based on viewpoint. And again, he's also saying that in his— I thought his broader point—I'm looking at—we're referring to the same email, I assume, right? This is the email that— That's—yes. He said that every type of drag show, not just a certain type of drag show, but all would be prohibited under this policy. You yourself cite—I'm trying to remember, it's a Sigma Chi case— That's correct. —out of the Fourth Circuit, a case preceding CLS Martinez. But I mention it because there's an example of a very different kind of drag show. And yet that—so in other words, I assume—let me ask you this. Does the record indicate whether the university would have the same view of that type of drag show as opposed to this type of drag show? You know, this type of drag show is put on by an LGBT group. The other drag show was put on by a fraternity. Very different kind of messaging. Do we know what the university's position would be on that one? Because, you know, depending on its answer, you might have a better viewpoint discrimination case. Well, I think the university has taken the position that it's President Wendler's personal views that dictate what free expression can occur in designated public forums on campus. Iota Chi is a very persuasive— —President Wendler, but I think you could do the same with CLS, right? It's Dean Herma Hill Kay. She has one view. It was not the view that the university had done before. They had allowed groups like the Democrats and the pro-life groups and other groups to exclude. It was only when the Christians came that all of a sudden you had to have all comers. And yet we had to defer to that. Certainly, Your Honor. I think if you want to borrow that example, if, say, this was a prayer circle and President Wendler said, I think that prayer circle is offensive to non-Christians, at that point CLS doesn't come into play. We're not talking about a neutral policy. We're talking about the university administrators excluding a group, say, from the campus quad because they disagree and they find, subjectively find, the Christian group's viewpoint offensive. No different here. You're saying CLS would be more analogous if the policy there only applied to Christians? I think CLS is just apples to oranges to this case because that's about a content-neutral policy. I guess where I'm going with this, though, is it sounds like this is a fact dispute. We're at the PI stage right now, right? And so unless there's something in the record that indicates that this was, in fact, you know, no drag shows for the LGBT group but drag shows for fraternity is just fine, do you have that in the record or is the record silent on that? We have President Windler's first line in his email where he says, West Texas A&M will not host a drag show. That, to me, is clear. He doesn't care what the drag show says. No, exactly. So I'll just take you at your word there. He does not care what it says. He does not care about the message. It is not viewpoint discriminatory. He cares that it's offensive. As this court said in Hunt County v. Robinson v. Hunt County, when the government makes a determination, a subjective determination, that speech is restricted on that basis. That is viewpoint discrimination. That makes sense, Your Honor, why we cannot allow the government, and the First Amendment does not allow the government to use the subjective term offensive to restrict speech. That is just an invis— Isn't that sort of what CLS is all about as well? The school, rightly or wrongly, decided that the Christian group and any group that excludes members based on a criteria, that's offensive. That is not inclusive. It's offensive to the university's interests and the Supreme Court. Again, Your Honor, I don't think that's what CLS was about because CLS was, this case is not about students excluding anybody. This case is about the university excluding students from a public forum. This, all CLS was about is saying, if you want to be on a public forum, if you want to be a registered student organization, then you have to abide by this content-neutral criteria. What President Windler— You abide by the university's policy of inclusion. That's one way to look at CLS, yes. I suppose that's the debate we're having is, what is the proper characterization of the CLS opinion? I think the CLS proper characterization is you had a content-neutral policy, which did not exclude anybody from a public forum. It simply said, you have to— Your Honor, as I understand it, Spectrum, your client, the organization, I'm sorry, Spectrum is the name of it, they're not excluded, they are actually being treated better by, than CLS, right? They have been allowed to register as a student group. They're allowed to use various facilities. They just can't violate certain content rules. They're being treated— That is better than CLS, isn't it? I have to disagree with you, Your Honor. They are being excluded from a public forum on campus. Under the campus— They're not allowed to have events of any kind? They're not allowed to hold—they're not allowed to engage in protected expression, which is a drag show, on campus. Just to be clear, are they allowed to have events of other kinds? I mean, I assume— I thought that was in the record. I'm asking you a record question. I'm just literally asking you, have they been allowed? I thought it was agreed that Spectrum has been allowed to have a lot of events at various university facilities. It's just that this one is what violated the content rules of the university. It is, Your Honor. They have been allowed to write and speak, but that doesn't— That's all I meant in terms of comparing to CLS. In fairness, CLS was not allowed to do anything. That's correct. Well, CLS—that's actually not true. I think CLS was allowed to engage in speech on campus. They just couldn't—they just didn't get the benefits of a registered student organization. Judge Alito had a pretty extensive dissent documenting all the various ways in which CLS was denied access to— Right, and Judge Alito's dissent was spot on. Exactly what he said. We don't defer, courts do not defer to college administrators. I think when you read CLS through the lens of— I'm guessing if you needed to, you would want the Supreme Court to overturn CLS. That would certainly favor your client in this case. I think it would, but I don't think it's necessary, Your Honor. Oh, I understand that. You're not here to defend CLS, is my point. I am not here to defend CLS. I'm trying my best to distinguish it, because I think where Your Honor is going with this, I think, again, when college officials—we know this from Papish, we know this from Healy—when public college university officials say, that speech is offensive, I don't want to allow it on campus, that is prohibited under the First Amendment. Think about—go back to Papish, where you had an independent journalist handing out a political cartoon depicting the Statue of Liberty being raped by police officers. A friendly, fun drag show pales in comparison to that, and the Supreme Court said that was protected. If that's protected, and university officials could not punish that after the fact, then certainly President Wendler cannot punish a drag show and impose a prior restraint on drag shows just based on his subjective belief that it is offensive. And this brings us to, I think, the case that really, the court should really look at— I'm sorry. Yes. I just want one specific question on the drag show issue. Do you agree that drag shows can be used to celebrate or denigrate particular populations? Just depends on what the message of that particular drag show is? I believe that audiences might interpret that from drag shows, and that— I think that's interpreted, but somebody could do a drag show like the Sigma Chi was alleged to have been specifically disparaging based on race and sex. Sure, and— I assume we can not only imagine, I'm sure we could find on Google, on the Internet, drag shows that are meant to be highly disparaging of the transgender community. The Ugly Woman Contest and Sigma Chi, the fraternity admitted, we're trying to be racist, we're trying to be sexist, and the Fourth Circuit said it doesn't matter. Right. The college needs to— Or CLS, but yes. Yes. The college needs to find a better way to meet whatever interest it has in preventing harassment than engaging in viewpoint discrimination. That's exactly what President Wendler is doing. Is there anything in the records, just to nail this point down, given that I think we agree that drag shows can be used for any sorts of messages, is there any evidence of what the president's policy would be with respect to one of those, or was it unknown? In his brief, he says, he intimates that no matter what the message intended was, he would have banned drag shows no matter what, because— And that's something you'll all be entitled to litigate at trial. This is just PI. It is, Your Honor, but the point here, we have a prior restraint. President Wendler has denied these students the right, under the First Amendment and campus policy, to go and engage in protected expression at an open campus forum, one that the campus has designated open to these students. You've used the term prior restraint. Just to be clear, CLS endured a number of prior restraints, and yet the university won in that case, right? You could characterize it as that, Your Honor, but again, that was a content-neutral prior restraint. We're talking about a content-based one here, so even if the court doesn't accept that this is viewpoint-based, it's still content-based. Drag show is a genre of protected expression. You have to look at the content to know what a drag show is. Even in a content-based prior restraint, strict scrutiny still applies. You still have that heavy presumption of unconstitutionality. I thought strict scrutiny only applies to designated public forums, not to the so-called limited public forums. There's a caveat with that. Strict scrutiny obviously applies to designated public forums, and we've briefed the reasons why that is here. Even if the court finds this to be a limited public forum, strict scrutiny still applies. As this court said in Hayes County v. Supple, when a government excludes a speaker from a limited public forum for whom the government created that limited public forum, strict scrutiny applies. The same standards . . . Is that what CLS says, though? I thought CLS talked about, you know, as long as you have a policy that is reasonable in light of the purposes of the forum and viewpoint neutrality, to be sure, but . . . I assume we have to apply the same scrutiny level that CLS applies when it comes to limited public forums. I think CLS is narrow because the parties there agree that it was a limited public forum. The Supreme Court said in Forbes . . . They just agree. The court also specifically . . . I mean, the court points out two things. One, that the parties agreed, and two, that that agreement was bound by law. There's a footnote. I forget where. I'm wasting time. But it says, I think it cites Rosenberger and Widmar, because this is a limited public forum and not a designated. That's correct, Your Honor. Even if this is a limited public forum, we have viewpoint discrimination. That's barred in any sort of public forum. So this turns on whether we see this as viewpoint discrimination. No, Your Honor, because we still contend this is a designated public forum. Look no further than the university's free expression policy, which says . . . Let's do that. I thought the policy said that the university reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University system, the rules and procedures of WTAMU, or if an event is deemed to be unsafe. It sounds like that's not the indiscriminate open to the public that the court requires when it comes to designated public forums. Your Honor, I see my time is up. May I be able to answer your question? That's fine. And I disagree with that, because the policy . . . the university policy also says, campus buildings are open to anything protected under the First Amendment where drag performances are, subject only to content-neutral time, place, manner restrictions. President Wendler's letter does not impose a content-neutral time, place, and manner restrictions. What is the record site? I want to make sure I credit what you just said. Is it President Wendler's letter, Your Honor? No, no, no. I have that. When you say that the university essentially opened it to anything protected by the First Amendment, to all buildings . . . That would be on Record 272, Exhibit C, to our First Amendment complaint. And that's the campus free expression policy I believe Your Honor was just reading from. Okay. That's 272. I'm looking at 269, which is the facility use request procedure. Right. So, we need to read these two documents. I have the other page as well. I don't see your citation as trumping what I just cited. And I misunderstood your question, Your Honor. Can I briefly just address that? You can always take time to answer a question. Thank you, Judge Southwick. That's when your time ends. Okay. So, very briefly. The university went through that procedure here. The students followed the rules. The university staff followed the rules. They found no policy that this direction would violate. It was only when President Wendler commandeered this process to impose his personal views over the First Amendment that this became a problem and conflicted with the university's own expressive use policies as well as the First Amendment. Thank you, Your Honor. May it please the Court. Spectrum has not met its burden to obtain a preliminary injunction because there was and there is no imminent injury. The district court couldn't have abused its discretion because there were, when it came to Spectrum, WT's plan, next plan, drag show. And with that time, Spectrum was able to take their arguments and go straight up to the U.S. Supreme Court, which denied them relief unanimously. Now, with no— Your argument is that there's no irreparable injury? Your Honor, our argument is that there's no First Amendment inherently expressive activity at all, so there can be no injury. No. That's one of our two, our two arguments. The other one is, of course, the CLS argument. You may have better arguments out there. Yeah. No. But now with no— But, Your Honor, also, they don't even have a planned drag show anymore, right? So they had a planned drag show this year. And that was canceled after the Supreme Court unanimously denied their application for an injunction pending appeal. And since then, there's been no application for another drag show in the meantime. And President Wendler just believes that this— This is not like a mootness argument? Is that where you're going? Sorry, Your Honor. He obviously wanted to do the show at that time. I get that that's in the past, but so is your point that that P.I. request is moot and he should now go to trial on the merits? Yes, Your Honor. I think that the— Yes, Your Honor. I do believe that it's moot and I believe that this Court can affirm and remand on that basis for the factual— Well, Ken, have you made that argument at all in your briefing that it's moot? We didn't make an argument that it was moot for—well, for a couple of reasons, Your Honor. Before the—before—after a briefing was finished, was completed, that is when Spectrum filed their application for an injunction pending appeal and went to the Supreme Court. Once that was decided, their drag show that was scheduled for March was not—was only canceled after that. Counsel, tell me what is in the record to indicate whether a decision effectively has already been made of whether Spectrum WT could have a drag show either in this theater, in this hall, or anywhere else on campus? Has that decision already been announced either through that initial email or through something else in the record? I'm sorry, Your Honor. If I heard your question correctly, are you asking if they are not aware in the record that it says that they are not— I'm trying to indicate, looking at the preliminary injunction, irreparable injury, what do we know from this record of whether the decision effectively has already been made that they cannot conduct a drag show on campus, whether it's last semester, next semester, or any other time? Yes, Your Honor. So, that would be President Wendler's letter, his email, when he canceled the 2023 drag show, and he effectively said that nobody could hold a drag show on campus. So, you would agree this record would show that they cannot have a drag show whether it's next student year or any other time, so long as that decision stands? Not only them, but no student organization could have a drag show. Fair enough. The broader answer. Thank you. Keep going. So, Your Honor, I would like to discuss, actually briefly, one thing that came up in my friend on the other side's argument, where he discusses how—and this ties into our argument that drag shows are not inherently expressive activity—inherently expressive conduct. What President Wendler was doing when he banned drag shows and he said that they were offensive in his letter, I mean, this was no different than essentially banning any sort of offensive conduct. Like, you know, you can imagine, like, dropping weights on the university gym floor or skateboarding on the grounds of a monument for, you know, war dead on a university campus. These are things that people can do, but, you know, that might be, you know, offensive, but they're not speech. I'm going to move on to talk about Christian legal society. If the Court disagrees with our assessment that drag shows are not inherently expressive activity under the First Amendment and under Rumsfeld v. Fair, then we're squarely in the realm of Christian legal society. And the Court should affirm, because Legzi Hall is a limited public forum and President Wendler's drag show ban is viewpoint neutral. So first, Legzi Hall is a limited public forum. University policy identifies only, quote, common outdoor areas of the university's campus as, quote, traditional public forums. That's at ROA 273. Legzi Hall is thus not within the scope of what the university has identified as a public forum. Further, the Supreme Court has rejected the view that this status, that the public forum status extends beyond its historic confines without some sort of, you know, additional indication, for example, a designation, okay, like designating a forum as public. Now, in their reply, even though it points to a number of activities expressive and non-expressive that have taken place in Legzi Hall in the past, the past doesn't typically bind the state limited forum and was not required then to set up a requested display after that forum was closed to pretty much all displays in their entirety. Further, I know they mentioned this in their reply brief, the last drag show to take place was over five years ago in Legzi Hall, and again, this just reflects a change in policy based on President Wendler's experience. Anyway, Legzi Hall is a limited public forum, and President Wendler's policy satisfies the limited public forum standard, which effectively is intermediate scrutiny, right? His restriction has to be reasonable. It can't discriminate on the basis of viewpoint, as Your Honor was discussing with my friend on the other side earlier. And the . . . Is there anything in the record to indicate what the university's policies would have been with respect to the Sigma Chi type of drag show in the Fourth Circuit case? Your Honor, I do think that handbook . . . some of the sections in the handbook that deal with harassing conduct, for instance . . . Well, his email . . . . . . might have applied to the . . . I understand that his email says no drag shows of any kind. Right. Okay. Which I assume would include the Sigma Chi as well as the LGBT group. Yes, Your Honor. If you're asking if his . . . if the policy that's been implemented regarding drag shows applies to that, it does . . . I'm just asking about the record. Yeah. What record evidence do we have as to whether it's only because of the message that Spectrum wanted to convey, or is it the content of having a drag show of any kind? I thought it was no drag shows of any kind, but was asking . . . I'm asking now both sides. Is there anything to contradict the university president's statement that no drag shows of any kind would be permitted? No. There's nothing to . . . So a drag show that disparaged the LGBT community, or any community, equally prohibited. Yeah, that's correct. Your Honor, I mean, if a Christian legal group wanted to have like a drag for Jesus event, that would also be banned. It doesn't matter what group you are or what the purpose is of the drag show. Whether the drag show itself is to mock or make fun of the LGBTQ community, you're not allowed to have it on the campus. Right. I recall, I forget if it was Saturday Night Live or some other show years ago had something like that that was disparaging towards the transgender community. That, too, would trigger the president's concerns, I take it. Yes, Your Honor. Now, when President Wendler implemented this drag show ban, he was relying on decades of deference to college officials. I mean, it's not absolute. It does say that it's not absolute deference, but it does say that their opinions have to be taken into account, and some caution has to be taken when approaching their decisions with kind of tailoring the educational environment to achieve the mission of the school itself. Basically, it says that serious account should be taken of the professionals, of the school administrators' opinions about how to, again, how to kind of manage policies on campus and regulate activities on campus. You know, and it was relying on that expertise, on his own expertise, again, decades, that President Wendler imposed a viewpoint neutral ban on drag shows. And, again, I just really want to emphasize that it doesn't matter who you are, you can't do a drag show. And it's kind of like with Hastings' all-comer policies and all-comers policy in Christian Legal Society. You know, President Wendler said he wanted to encourage, and this is a quote from Christian Legal Society, he encouraged tolerance, cooperation, and learning among students, end quote. And he didn't want to subsidize, you know, lewd or harassing behaviors by granting access to a limited public forum. Now, and just to be clear, this is not, you know, a ban in the sense of, and because counsel on the other side brought up, it was Texas v. Johnson, the flag burning case. Okay? This is not like a criminal ban. There are no ramifications for anybody in the student group for putting on a drag show anywhere off campus. There's no, you know, disciplinary actions that will be taken. And furthermore, they have free access to the campus for all sorts of events, you know, to include, you know, movie nights like they, you know, put on and— I recall the Supreme Court sort of made the same point in CLS, right, that CLS can always do its Bible studies on private facilities. Yes. Yes. And that actually also goes to the harm analysis. Again, the— Correct. That's correct, Your Honor. That's correct. I mean, and there are numerous, and we talked about this in our brief, there are numerous school resources that, again, that the school provides to, you know, the LBGT community. And, I mean, there's been no suppression of their message, there's been no suppression of their speech or their viewpoint on campus whatsoever. They have free reign. It's just they, nor the—neither them, nor the Christian Legal Society or any other society on campus, Federalist Society, none of them can put on a drag show. And, again, that actually does go a little bit to the harm analysis. Again, there's really—again, they're able to do everything they want to do. They're able to say all the speech they want to speak. They just can't do this one particular thing in this one particular place. So, and there are other places available to them. All right. Now, Your Honor, unless there are any further questions, President Wendler requests that the Court affirm the District Court's denial of the preliminary injunction. But, if the Court were to disagree with our views on whether this is covered by the First Amendment or even about the form analysis, President Wendler thinks that the appropriate, you know, remedy here, again, would be then to just remand back for factual development, maybe clarify the law. But, again, we're in an interlocutory posture right now. And President Wendler thinks that the Court should be affirmed. But, otherwise, you know, there's still some facts to be developed. Thank you. All right. May it please the Court. The necessity of a preliminary injunction against each official must be analyzed separately. And plaintiffs did not and have not clearly carried their burden of persuasion on all preliminary injunction requirements against Dr. Thomas, the Vice President of Student Affairs for West Texas A&M, or Chancellor Sharp, who is the Chancellor over the Texas A&M University System. In fact, plaintiffs have not meaningfully argued otherwise to this Court. They haven't been mentioned once today during argument, and they're barely mentioned in the opening brief. Turning first to plaintiffs' likelihood of success on the merits, neither Chancellor Sharp nor Dr. Thomas have remotely engaged in viewpoint discrimination, exclusion from a public forum, or a prior restraint of plaintiff's speech. What is in the evidence other than a—well, this may not be evidence—what is in the evidence about how Chancellor Sharp may or may not have interfered with First Amendment decisions on campuses in that system? Yes, Your Honor. Plaintiffs have pointed to one instance in the underlying record and another instance in their briefing to this Court where Chancellor Sharp has become involved in free speech issues. However, both were at the request of the Texas legislature. And as the Chancellor of the system, he is directly responsible for legislative relations. There was nothing— I do not believe he does, Your Honor. She has general management over the system as a whole. He does not get involved in the decisions at individual component universities related to the day-to-day student activities. That's further supported by the affidavit of the vice chancellor that's before the Court around page 546. And it is apparent that the plaintiffs are not seeking relief against either Dr. Thomas or Chancellor Sharp for their involvement in Wendler's decision to ban drag shows. Rather, it's that they didn't step in and do something to stop him. But Section 1983 claims for injunctive relief cannot be based on vicarious liability. What did Dr. Thomas do other than deliver the message? Nothing. In fact, the record shows that under Dr. Thomas, the reservation requests for plaintiffs, whether for queer movie night or a queer history night or even the drag show, have proceeded under the normal course under the Division of Student Affairs and the Risk Management Office. In fact, the 2024 drag show was even confirmed by that office prior to Chancellor, prior to President Wendler canceling it. And plaintiffs admitted moments ago during oral argument that the administrators followed the policies and the rules of West Texas A&M and the system in processing these different applications. But the district court did find standing, which means regressibility, against these two, correct? Well, the district court stated . . . What do you mean by that? I mean, everything else seemed to be going your way. Why standing? The district court's . . . I would interpret the district court's holding on standing as tenuous at best. What the district court held was that it could not be certain at this early stage that plaintiffs cannot prove any set of facts in support of their claims against Dr. Thomas and Chancellor Sharp. But that finding is a far cry from, one, the standard for standing at summary judgment, if this case proceeds further, or from satisfying plaintiffs' heightened burden for a preliminary injunction against either Chancellor Sharp or Dr. Thomas. It's also worth mentioning that an injunction in this instance against either Sharp or Thomas would be overly broad, because plaintiffs have not demonstrated that an injunction against anyone other than President Wendler is even arguably necessary. Ordering Sharp to cease violating plaintiffs' rights will not provide plaintiffs with relief. Sharp can only stop President Wendler by undertaking an affirmative action beyond the bounds of prospective relief permitted under the ex parte exception to sovereign immunity. And ordering Thomas to cease violating plaintiffs' rights does not place him in a position to override Wendler's decisions. Rather, plaintiffs' claimed entitlement to the extraordinary remedy of a preliminary injunction is far from clear here, and the district court's decision should therefore be affirmed as to both Dr. Thomas and Chancellor Sharp. Thank you. Two brief points on your disability, Your Honor. This is not moot. The plaintiffs here have said and verified in their complaint this is an annual drag show. They intend to hold these every year. We're talking about a year-long prior restraint. Which leads me to my second point. Well, also the email says harmless drag show not possible. That's correct. That's correct. I'm not sure I understood the mootness argument. I don't either, Your Honor. So, I think the court should reject that. Number two, Chancellor Sharp, this is not about his day-to-day authority. This is about his authority to put an end to a year-long prior restraint. He has the authority over President Wendler, and he has the authority to do what's best for the campus. He should have put an end to this prior restraint, which shouldn't have lasted a day. It's now lasted a year. The district court was right to find at this early stage we have standing over Chancellor Sharp. My final point is . . . Your point is just the hierarchy of the university. One would presume that the chancellor of the whole system can dictate policy. I don't know if that's true, but I would . . . Well, I think that's correct, and it falls within this court's decision from last year in Jackson v. Wright, where the court found that a board . . . University of North Texas' board had . . . the plaintiffs there had standing over campus officials who engaged in First Amendment retaliation. I want to point the court to Healy v. James, because I've heard a little bit here about the fact that plaintiffs can speak elsewhere on campus. That's what the university president in Healy v. James said when he tried to impose a prior restraint on access to a public forum. The Supreme Court rejected that. The Supreme Court rejected the same thing in southeastern promotions. One does not have to have his . . . one is not to have his First Amendment rights abridged just because he can speak somewhere else. And here, my friend on the other side made it clear. No matter who you are at West Texas A&M, you can't put on a drag show. You can't engage in protected expression. That is a prior restraint. And this is my last point. I think this . . . going back to your . . . our discussion earlier about . . . With the same . . . just out of curiosity, because I want to take your principle and or no public nudity policy, and it cut across all viewpoints. Would that be okay? If it was applied in a viewpoint . . . In a content-neutral fashion. I don't care what your view are. We're not going to have nudity. We don't want that content at a university campus. Not as to drag shows, because drag shows . . . I'm not saying this is . . . it's not hypothetical. It has nothing to do with this case. Yeah, I think Barnes and Papps answered that question, yes. But my last point, and we were discussing a little bit about CLS, Your Honor. I think this is an opportunity for this court to clarify that CLS is a narrow decision. There, the party stipulated that it was an all-comer policy that applied equally. It did not target religious groups. And they had a policy . . . an actual, tangible policy there. This case is about a university president grabbing unfettered discretion and saying, my views, not university policies . . . But wouldn't you rather get it overturned? Excuse me, Your Honor? Wouldn't you rather just get that case overturned? It seems like you have a good vehicle here. I would love to have CLS overturned, Your Honor, but . . . But we're . . . and I see my time is up. Can I just briefly collude? We have a year-long prior restraint here. These students have been suffering under that and have had their expressive freedoms . . . You said that before, that CLS had the same prior restraint. It's . . . I know we're quibbling on certain aspects of the facts, but it's the same basic thrust at a minimum. I . . . Student groups wanting to participate on campus, not being allowed to. If it's a prior restraint here, it's a prior restraint in CLS. And yet, the court sided with the university. I disagree. It was a content . . . What makes it . . . I get that we're having a discussion about content neutrality and viewpoint neutrality, but that's not . . . that's different from prior restraint. Are you saying this is a content neutral prior restraint or . . . I thought you were saying this is not a prior . . . I'm sorry. I thought you were saying that CLS didn't have a prior restraint at all, which doesn't make any sense to me. They're both prior restraints. We can quibble about whether you can distinguish CLS, but they're both prior restraints, aren't they? Both want to talk in advance. Both want to have a campus facility in which to engage in expressive activity. Both are being prohibited from doing so in advance. The difference is the prior restraint here is based directly on the viewpoint and content. Okay. That's your distinction. All right. This is like the prior restraint in Healy. This is like the prior restraint this court struck down in Gay Student Services versus Texas A&M. This is like the prior restraint in Southeastern Promotions. If there is a lodestar case for this court to follow, if Southeastern Promotions viewed through the lens of Healy, Papish, and Iota Chi, it's a straightforward path to reversal and put an end to this ongoing prior restraint. I thank the court for its time this morning. Mr. Director. Mr. Morris, your conversation with our colleague, I think your position is that CLS wasn't a prior restraint case, that it was a membership of student organizations, not what people would say but who would be allowed, what kind of organizations would be allowed regardless of their viewpoint. Just flesh out, what is your position on the relationship between the doctrine of prior restraint and CLS? Well, I think the difference with CLS and if the court views it as a prior restraint . . . I'm not looking for a distinction between your case and CLS. Tell me how the doctrine of prior restraint applies to the analysis in your view of CLS. The prior restraint here is akin to the prior restraint in Southeastern Promotions, unlike CLS. There you had the officials exercising unfettered discretion to impose their subjective views about what speech would and would not be allowed to take place in a public forum. That's very different from CLS where they had a content neutral policy the officials were applying. They weren't exercising unfettered discretion. They were applying a policy. Here, the danger is the unfettered discretion that President Wendler has taken upon himself to impose his values and his beliefs over the First Amendment. I hope that answers your question, Judge Self. Well, you were in the vicinity. My question probably wasn't clear. Did you have something . . . Just a quick follow-up. Hypothetically, I'm not obviously predicting anything, but hypothetically, if this Court were to end up affirming, are you all going to ask the Supreme Court to, A, take cert, and B, to overturn CLS? I can't promise . . . I can't predict the future, Your Honor, but we have asked the Supreme Court already, and I would assume that we would ask the Supreme Court again, but again, I would implore the Court, and we very much urge the Court, to put an end to the prior restraint here. Thank you, Your Honors. All right, Counsel. That ends our session for today. We will be in recess until tomorrow at 9 a.m.